1

2

3

4

5

6

7

8

9

10                        IN THE UNITED STATES DISTRICT COURT

11                      FOR THE EASTERN DISTRICT OF CALIFORNIA

12    TIMOTHY LEE BYRD,

13                 Petitioner,                    No. CIV S-02-2013 MCE JFM P

14          vs.

15    GAIL LEWIS, Warden, et al,

16                 Respondents.              FINDINGS AND RECOMMENDATIONS

17    _____/

18                 Petitioner is a state prisoner proceeding through counsel with an application for a

19    writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2000 conviction on

20    charges of unlawfully driving or taking a vehicle and falsely identifying himself to an officer.

21    The court found true allegations of four prior serious felony convictions.  In his September 13,

22    2002 petition, petitioner claims his right to a fair trial was violated by various jury instruction

23    errors and alleges the sentence of twenty-five years to life in prison violates the Eighth

24    Amendment.[1]

25    _____

26          [1]  In his traverse, petitioner also argues ineffective assistance of counsel relative to some
      of these claims and includes a new claim that petitioner's right to make a knowing and intelligent

                                              1

1

FACTS[2]

2
3
4

    Lorena Coen (Coen) began drinking at home at noon on June 26, 1999.  Later that afternoon she drove her 1984 Ford Mustang to the Valley Station bar and then five blocks away to Lewey G's bar in Rio Linda, where she continued her drinking.  She became intoxicated.

5
6
7

    After drinking at Lewy G's, she started to drive home, but she realized she was too drunk to drive.  She parked her car across the street from a house belonging to acquaintances, Gina and Dennis.  She heard her name being called by Eugean Allen, a man she had known for years.  Allen invited her to the party at Gina and Dennis's house and she accepted.  Coen continued to drink there.

8
9
10
11
12

    Coen drove the half block to Lewey G's a couple of times during the party.  At trial, she remembered having people, perhaps including the [petitioner], in her car.  She recalled driving to the American Legion Hall behind Lewey G's.  At some point during the day while driving her car, Coen saw a highway patrol car, which she thought [petitioner] might have brought to her attention.  Realizing she should not be driving, she parked in front of the Ace Hardware store next to Lewey G's.

13
14
15
16

    After seeing the highway patrol officer, Coen went into Lewey G's and exchanged shirts with a male customer at the bar and put her hair in a ponytail, so that she would not be recognized by the officer.  Coen forgot she was not wearing a bra when she changed her shirt and exposed her upper torso.  The officer came into Lewey G's, looked around and left.  Coen then called her boyfriend, Mike, to give her a ride home.

17
18
19

    Coen went out to lock her car, when Mike arrived, but she could not find her keys.  She locked the car manually, intending to return the next day with a spare set of keys.  She recalled last seeing her keys, which included her house key, when she was trying to avoid the highway patrol officer.

20
21

    The next day, Mike called and told Coen her car was no longer in front of Ace Hardware.  Two hours later, she reported her car

22
23
24

plea decision was invalidated by the instructional errors.  However, a traverse is not the proper pleading to raise additional grounds for relief.  See Cacoperdo v. Demosthenes, 37 F.3d 504, 507-08 (9th Cir.1995). In general, claims not raised in the petition are not cognizable on appeal.  See United States v. Allen, 157 F.3d 661, 667 (9th Cir.1998) (citing Cacoperdo, 37 F.3d at 507).  Thus, this court has not addressed these newly-raised claims.

25
26

    [2]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Byrd, No. C034582 (November 21, 2001), a copy of which is attached as Exhibit 2 to Respondent's Answer, filed March 24, 2003.

1
2

stolen and, at some point, posted signs.  She did not know where the car was and heard nothing from [petitioner] during the time the car was missing.

3
4
5
6
7

Coen did not remember giving her keys to [petitioner], but she could not say that she had not.  While it was possible Coen gave him the car to drive himself home, she did not believe she did so, and she did not believe she lent him her car for several days.  She recalled lending her car to Gina once, but knows she would not have lent her car to someone for several days because she had never done so, and she needed the car to drive to work.  While her car was missing, ths temporarily lost her job.

8
9
10
11
12

Coen testified that her continuous drinking that day affected her memory.  At trial, Coen testified she thought [petitioner] was at the party at Gina and Dennis's house, but did not recall socializing with him.  While she may have seen [petitioner] in the bar on a prior occasion she did not recall "partying" with him.  She knew she had never gone out with [petitioner], he never had been to her house, and she had never been to his.  Although they had mutual friends and Coen knew [petitioner] by sight, she did not know his name.

13

Coen testified only pursuant to a subpoena from the prosecutor.

14
15
16
17

On June 30, 1999, at approximately 11:30 p.m., California Highway Patrol Officers Jeff George and Dwight Havens stopped a Ford Mustang on Elkhorn Boulevard near Watt Avenue because the car was weaving and the driver was not wearing a seat belt.  [Petitioner] was driving.  When stopped, [petitioner] jumped out of the Mustang and said he never had a driver's license.  He falsely identified himself as Carl Pajaro.  The officers believed [petitioner] had been driving under the influence.

18
19
20

A license plate check revealed the Mustang, later found to belong to Coen, was stolen.  When the officers attempted to arrest [petitioner], he began to struggle and all three men fell to the ground.  [Petitioner] stopped struggling only when George pulled his gun and ordered him to do so.

21
22
23
24

Officers found [petitioner's] wallet in the vehicle, which contained an identification card with [petitioner's] photograph and name.  The Mustang's radio had been taken from the dash of the car, the headliner was torn and the keys were in the ignition.  [Petitioner] possessed other keys.  Bags of food, packs of cigarettes and an open container of alcohol were found in the car.

25
26

[Petitioner] was arrested for vehicle theft, receiving stolen property and driving on a suspended license.  He asserted his rights pursuant to Miranda v. Arizona (1966) 384 U.S. 436 . . . but volunteered a statement.  He stated he did not take the car, he had

1   been drinking in a bar in Rio Linda with a girl named "Lorie," who
    lent him the car and gave him the keys; he had been in possession
2   of the car for five days.

3       When Coen retrieved her car, she found a 12-pack of beer, a half-
    eaten taco and two packs of cigarettes belonging to someone else.
4   The things she had kept in the car, some clothes, her purse, and her
    son's toys, were gone.  She confirmed the radio had been ripped
5   out and the headliner was gone.  The car would not move in
    reverse and by the time she got it home, it would not go forward.
6   The car was cleaner than she had left it to the extent that items she
    had left in it were gone.  Her keys were in the same condition as
7   she had left them.

8       Eugean Allen, [petitioner's] cousin, testified for the defense.  He
    said Coen gave [petitioner] the keys to her car when they were
9   sitting at Lewey G's bar.  Coen told [petitioner] he could have the
    keys and to take the car as if she no longer wanted it.  Allen
10  thought Coen was drunk.  Allen did not hear [petitioner] ask to
    borrow the car or for the keys.  Coen did not say she needed a ride
11  home and was still in the bar when [petitioner] and Allen left.
    Coen's car was parked in front of the bar and [petitioner] used it to
12  drive Allen home.

13      Before going to the bar that evening, Allen had seen Coen at the
    house party until 10:00 or 11:00 p.m. when Coen, Allen and
14  [petitioner] went to Lewey G's.  At the party, Coen had been
    dancing around, removing her shirt, flashing her breasts and
15  "kissing on everybody, and just acting like a fool."

16      Allen started drinking about 3:00 p.m. and when he left Lewey
    G's bar he had "a good buzz."  He admitted having been convicted
17  of assault and battery.

18      Sandra Coen, Lewey G's sole bartender and Lori Coen's sister-
    in-law, testified in rebuttal.  According to Sandra, Coen did not
19  usually lend her car to anyone even when she was drunk.  About
    8:00 or 9:00 p.m. on June 26, 1999, Coen came to the bar drunk.
20  Coen thought a highway patrol officer was looking for her, so she
    exchanged shirts with a male customer at the bar and put her hair
21  in a ponytail.  The officer came into the bar, but left without
    noticing Coen, who then waited in the bar for an hour for her ride
22  home.  Sandra did not serve alcohol to Coen during that time.

23      Shortly after Coen came into the bar, Allen arrived with three or
    more men who Sandra did not know although they seemed to know
24  Coen.  Allen asked for a work application and stayed about 15
    minutes but was not served any alcohol.  [Petitioner] could have
25  been in the bar.

26  /////

4

1         Aided by a busboy and a couple of other people, Coen looked
without success for her keys, which she thought she had thrown
2    when the officer was looking for her.  During this time Coen's car
was parked in front of the hardware store and Sandra's husband
3    went out to the car and rolled up the windows.

4         At approximately 9:15 p.m., Coen left with her boyfriend, Mike.
An hour before closing, a woman named Sonya came into the bar
5    and asked about Coen.  Sonya was with a man Sandra did not
recognize.  About 45 minutes before closing, Sandra saw Coen's
6    car still parked at the hardware store, but the car was gone when
she closed the bar.

7

8    (People v. Byrd, slip op. at 2-7.)

9                                  ANALYSIS

10    I.  Standards for a Writ of Habeas Corpus

11         Federal habeas corpus relief is not available for any claim decided on the merits in

12    state court proceedings unless the state court's adjudication of the claim:

13         (1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
14    determined by the Supreme Court of the United States; or

15         (2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
16    State court proceeding.

17    28 U.S.C. § 2254(d).

18         Under section 2254(d)(1), a state court decision is "contrary to" clearly

19    established United States Supreme Court precedents if it applies a rule that contradicts the

20    governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

21    indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

22    result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

23    (2000)).

24         Under the  "unreasonable application" clause of section 2254(d)(1), a federal

25    habeas court may grant the writ if the state court identifies the correct governing legal principle

26    from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

1   prisoner's case.  <u>Williams</u>, 529 U.S. at 413.  A federal habeas court "may not issue the writ

2   simply because that court concludes in its independent judgment that the relevant state-court

3   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

4   application must also be unreasonable."  <u>Id.</u> at 412; <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63,

5   123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent

6   review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

7          The court looks to the last reasoned state court decision as the basis for the state

8   court judgment.  <u>Avila v. Galaza</u>, 297 F.3d 911, 918 (9th Cir. 2002).

9   II.  <u>Petitioner's Claims</u>

10          Petitioner's first two claims pertain to jury instructions.  In general, a challenge to

11   jury instructions does not state a federal constitutional claim.  <u>See</u> <u>Middleton v. Cupp</u>, 768 F.2d

12   1083, 1085 (9th Cir. 1985) (citing <u>Engle v. Isaac</u>, 456 U.S. 107, 119 (1982)); <u>Gutierrez v. Griggs</u>,

13   695 F.2d 1195, 1197 (9th Cir. 1983).  In order to warrant federal habeas relief, a challenged jury

14   instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but

15   must violate some due process right guaranteed by the fourteenth amendment."  <u>Prantil v.</u>

16   <u>California</u>, 843 F.2d 314, 317 (9th Cir. 1988) (quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 146

17   (1973)).  To prevail on such a claim petitioner must demonstrate that the "ailing instruction . . .

18   so infected the entire trial that the resulting conviction violates due process.'"  <u>Middleton v.</u>

19   <u>McNeil</u>, 541 U.S. 433, 437 (2004) (quoting <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 (1991)).  In

20   making its determination, this court must evaluate the challenged jury instructions "'in the

21   context of the overall charge to the jury as a component of the entire trial process.'"  <u>Prantil</u>, 843

22   F. 2d at 317 (quoting <u>Bashor v. Risley</u>, 730 F.2d 1228, 1239 (9th Cir. 1984)).  <u>See also</u>

23   <u>Middleton</u>, 541 U.S. at 437.  Where, as here, the challenge is to a refusal or failure to give an

24   instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an

25   incomplete instruction, is less likely to be prejudicial than a misstatement of the law."

26   <u>Henderson v. Kibbe</u>, 431 U.S. 145, 155 (1977).  <u>See also</u> <u>Villafuerte v. Stewart</u>, 111 F.3d 616,

1   624 (9th Cir. 1997).  A habeas petitioner is not entitled to relief for failure to instruct unless the

2   record demonstrates that the trial error had a "substantial and injurious effort or influence in

3   determining the jury's verdict."  (Brecht v. Abrahamson, 507 U.S. 619, 633 (1993) (quoting

4   Kotteakos v. United States, 328 U.S. 750, 776 (1946).)

5          Where the state court has found a constitutional error to be harmless error, the

6   district court must determine both "(1) that the state court's decision was "contrary to," or an

7   "unreasonable application" of Supreme Court harmless error precedent; and (2) that the

8   petitioner suffered prejudice under Brecht from the constitutional error."  Inthavong v. Lamarque,

9   420 F.3d 1055 (9th Cir. 2005).

10         A. Claim One

11         Petitioner's first claim is that the trial court's failure to *sua sponte* instruct the jury

12  on mistake of fact, CALJIC 4.35,[3] was not harmless beyond a reasonable doubt.  Petitioner

13  argues this instruction was critical to his defense because if the jury believed the victim had given

14  petitioner the car keys, or consented to petitioner's use of the car, it would have negated the

15  specific intent element of the offense and allowed the jury to find petitioner not guilty of count

16  one.  Without this instruction, petitioner contends, the jury was unable to credit his defense that

17  the victim willingly gave petitioner the car keys and/or loaned him the vehicle.

18         The California Supreme Court denied petitioner's petition for review without

19  comment.  The last reasoned rejection of this claim is the decision of the California Court of

20  Appeal for the Third Appellate District on petitioner's direct appeal.  The state court found there

21  was sufficient evidence to warrant giving CALJIC No. 4.35.  (People v. Byrd, slip op. at 12-13.)

22

23         [3] CALJIC 4.35 provides:
        "An act committed or an omission made in ignorance or by reason of a mistake of fact
    which disproves any criminal intent is not a crime.

24         Thus a person is not guilty of a crime if [he] [she] commits an act or omits to act under an
    actual [and reasonable] belief in the existence of certain facts and circumstances which, if true,

25  would make the act or omission lawful."
    (Id.)  Because petitioner was charged with a specific intent crime, his mistake of fact could have

26  been reasonable or unreasonable.

1    The state court reasoned as follows:

2        [The court notes] the instructions given did not require the jury to
     resolve this factual question adversely to [petitioner].  (Citation
3    omitted.)  While the jury necessarily decided Coen did not consent
     to [petitioner's] use of her car, the jury was never required to
4    decide whether [petitioner] believed Coen had consented.  While
     factually related, the two issues are different.  Put simply, there is a
5    difference between Coen having given consent and [petitioner]
     believing Coen gave consent.  If the jury thought [petitioner]
6    mistakenly believed he had Coen's consent to take and use the car,
     that finding would negate criminal intent.

7
         [The court] will reverse a conviction based on this type of
8    instructional error where, after a review of the entire record, it
     appears reasonably probable [petitioner] would have received a
9    more favorable result absent the error.  [Citation omitted.]

10       Given the facts of the case, the jury, had it been given an
     instruction on mistake of fact, would have had to consider whether
11   [petitioner] mistakenly thought Coen had given him the car, either
     temporarily or permanently.  [Petitioner's] claim that Coen lent
12   him the car is convincingly belied by the following facts:  (1) he
     kept the car for five days and would apparently have kept it longer
13   had he not been stopped; (2) there is no indication that he tried to
     return it to Coen sooner; (3) Coen left her clothing and purse and
14   her child's toys in a car that she supposedly lent to him and all
     were removed from the car, as was the car radio; and (4) the
15   interior of the car had been damaged.  All are contrary to
     [petitioner's] argument concerning mistake of fact and all
16   demonstrate that a reasonable jury would not have credited
     [petitioner's] claim that he thought Coen had loaned him her car
17   for five or more days and that he planned to return it to her in the
     condition in which it was found.

18
         It is even less likely, that the jury would have thought [petitioner]
19   believed Coen gave him the car permanently.  This would have
     required the jury to conclude that [petitioner] believed a thoroughly
20   intoxicated woman, whom he barely knew, would intentionally
     give him the gift of a 1984 Ford Mustang containing her personal
21   items including her purse.

22       [The court] [concludes] it is not reasonably probable [petitioner]
     would have received a more favorable result from the jury, that is,
23   an acquittal on this count, if the jury had been instructed on the law
     of mistake of fact.

24

25   (People v. Byrd, slip op. at 13-14.)

26   /////

                                        8

1      A criminal defendant is entitled to an instruction on his theory of the case

2  provided that it is supported by law and has some foundation in the evidence.  Conde v. Henry,

3  198 F.3d 734, 739 (9th Cir.2000).  To obtain federal collateral relief for errors in the jury charge,

4  a petitioner must show that the ailing instruction by itself so infected the entire trial that the

5  resulting conviction violates due process.  See Estelle v. McGuire, 502 U.S. at 72.  Additionally,

6  the instruction may not be judged in artificial isolation, but must be considered in the context of

7  the instructions as a whole and the trial record.  Id.  The burden of demonstrating that an

8  erroneous instruction was so prejudicial that it will support a collateral attack on the

9  constitutional validity of a state court's judgment is even greater than the showing required to

10  establish plain error on direct appeal."  See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th

11  Cir.1996).  Moreover, a petitioner whose claim involves the omission of an instruction "bears an

12  especially heavy burden," because an omission is less likely to be prejudicial than a misstatement

13  of the law.  Reynolds v. Maddock, 1999 WL 354366, *3 (N.D.Cal.1999), aff'd 232 F.3d 896 (9th

14  Cir.2000).

15      As stated above, the Court of Appeal found that the trial court erred in failing to

16  give CALJIC No. 4.35.  The court held, however, that any error was harmless and nonprejudical.

17      The evidence of petitioner's belief he had the victim's consent to take or drive the

18  car was presented and argued to the jury, both in the testimony of petitioner's cousin, Eugean

19  Allen, and in defense counsel's closing argument.  Specifically, Mr. Allen testified that he saw

20  Ms. Coen give petitioner the car keys and saw her act as if she no longer wanted the car.  (RT

21  254, 255, 276, 278, 282.)  Mr. Allen testified he saw Ms. Coen talking to petitioner.  (RT 257.)

22  Mr. Allen saw them "having a good time," and saw Ms. Coen taking off her shirt and "sitting on

23  their laps."  (RT 257-58.)

24      At one point in the evening, prior to Ms. Coen giving petitioner the car keys, Mr.

25  Allen said Ms. Coen drove Mr. Allen and petitioner to the liquor store.  (RT 259.)  Mr. Allen

26  /////

1   testified that petitioner and he left the bar around midnight while Ms. Coen remained at the bar.

2   (RT 276.)

3            During closing argument, defense counsel argued that the prosecution failed to

4   prove, beyond a reasonable doubt, that petitioner took the car without Ms. Coen's permission or

5   that he somehow stole her keys.  (RT 406.)  Defense counsel argued that at the time of his arrest,

6   petitioner claimed he had been drinking with "a gal named Lorie at a bar in Rio Linda" (RT 411),

7   and that petitioner had the car for five days, that Ms. Coen had let petitioner borrow the car, and

8   had even given petitioner the car keys.  (RT 411.)  Defense counsel also argued that the

9   testimony was unequivocal that Ms. Coen had entered the bar and taken steps to evade the

10  highway patrol because even the bartender testified Ms. Coen came in, changed shirts and hid.

11  (RT 410.)

12           Although the Court of Appeal found the mistake of fact instruction should have

13  been given to the jury, the fact that it was not did not result in prejudice to petitioner and was

14  therefore harmless error.  The state courts' determination of this issue was not contrary to, or an

15  unreasonable application of, clearly established Supreme Court precedent.

16           Petitioner's defense counsel did not defend using a mistake of fact defense.

17  Rather, defense counsel focused on his position that the prosecution had not met its burden of

18  proof.  (RT 406, 407, 409, 410-11.)  Defense counsel asked a number of rhetorical questions (RT

19  406, 408, 409, 411), and emphasized the facts that would have supported a mistake of fact

20  defense, but he did not specifically argue that petitioner reasonably or even unreasonably

21  believed he had permission to either take or drive the car.  Because defense counsel did not argue

22  or rely on a mistake of fact defense, the state court's finding that the trial court's failure to *sua*

23  *sponte* instruct the jury on mistake of fact was not contrary to, or an unreasonable application of,

24  federal law.

25           Moreover, even had the jury received the mistake of fact instruction, it is unlikely

26  the outcome would have been different.  As noted by the Court of Appeal, there were other facts

1  that belied the contention that petitioner actually believed Ms. Coen had given him permission to

2  take or drive the car:  (1) he kept the car for five days and might have kept it longer had he not

3  been stopped; (2) there was no indication he tried to return the car to Ms. Coen; (3) Ms. Coen left

4  her purse, clothing and child's toys in the car, and all were removed from the car, as was the car

5  radio, when petitioner was arrested; and (4) the interior of the car had been damaged.  (People v.

6  Byrd, slip op. at 14.)

7          In addition, Ms. Coen and the bartender, Ms. Coen's sister-in-law, both testified

8  that they had searched for Ms. Coen's car keys.  (RT 144; 307.)  The bartender also testified that

9  she sent her bus boy out to the parking lot to look for Ms. Coen's keys.  (RT 307.)  The bartender

10 testified that Ms. Coen and some people from the bar went out looking for her keys.  (RT 307.)

11 And, the next day, Ms. Coen reported the car had been stolen, asked around the neighborhood

12 and posted signs about her missing car.  (RT 152.)  Ms. Coen testified that her missing car keys

13 also contained her house key and a big green clock.  (RT 145.)  If she had loaned the car to

14 petitioner as defense counsel argued, she wouldn't have been looking for her keys and she

15 probably would have removed her personal belongings from the car and at least taken her house

16 key off the key ring.

17         It was also unlikely the jury would have found petitioner actually believed Ms.

18 Coen gave him the car to keep because it was obvious to everyone, including Mr. Allen, that Ms.

19 Coen was intoxicated that night.  Ms. Coen's purse and other personal belongings were in the

20 car.  (RT 129.)  Thus petitioner was not prejudiced by the failure to instruct on mistake of fact.

21 Brecht, supra.

22         In light of the above, the state court's rejection of petitioner's first claim for relief

23 was neither contrary to, nor an unreasonable application of, controlling principles of United

24 States Supreme Court precedent.  Petitioner's first claim for relief should be denied.

25 /////

26 /////

1    B.  Second Claim

2         Petitioner's second claim is that the trial court's jury instruction that the jury could

3  find specific intent for vehicle theft based on petitioner's retention of the car beyond the scope of

4  consent was not harmless error and that the instruction lowered the prosecution's burden of proof

5  by allowing the jury to find petitioner guilty based only on clear and convincing evidence rather

6  than proof beyond a reasonable doubt.

7         At the close of the evidence and prior to arguments by counsel,
         the court instructed the jury on the elements of unlawfully driving
8        or taking a vehicle.

9         The prosecutor then argued [petitioner] either took the car with
         no permission, or took the car with Coen's permission to drive
10        himself and use it no more.  After the prosecutor's argument, out of
         the presence of the jury, defense counsel questioned whether the
11        prosecutor's characterization of a violation of Vehicle Code section
         10851[4] was correct, that is, whether the crime could be committed
12        by taking the car with permission, but later keeping the car beyond
         the permission given.  Defense counsel noted that the specific
13        intent to deprive either permanently or temporarily had to occur
         with the act of taking or driving the car.  The court agreed that it
14        was a "thorny issue [the court] certainly should have talked about
         in instructions."  Based on *People v. Gibson* (1944) 63 Cal.App.2d
15        632, the trial court proposed to instruct and did instruct, over
         defense counsel's objection, as follows:  "The failure to return a
16        vehicle that was obtained by consent in a timely manner does not
         by itself establish a violation of section 10851.  In determining
17        whether the continued operation or the continued possession of a
         vehicle beyond the agreed-upon time period, in determining
18        whether that establishes the criminal intent required you should
         consider all of the circumstances presented by the evidence.  [¶]
19        You should determine from the circumstances whether the
         continued use of a vehicle both as to the length of time and the
20        manner clearly and substantially exceeded the scope of the consent
         given.  If it does not clearly and substantially exceed the scope of

21  /////

22

23         [4] California Vehicle Code § 10851(a) provides:  Any person who drives or takes a
    vehicle not his or her own, without the consent of the owner thereof, and with intent either to
24  permanently or temporarily deprive the owner thereof of his or her title to or possession of the
    vehicle, whether with or without intent to steal the vehicle, or any person who is a party or an
25  accessory to or an accomplice in the driving or unauthorized taking or stealing, is guilty of a
    public offense and, upon conviction thereof, shall be punished by imprisonment in a county jail
26  for not more than one year or in the state prison or by a fine of not more than five thousand
    dollars ($5,000), or by both the fine and imprisonment."  (Id.)

12

the consent given, then the required criminal intent would not be clearly established."

In addition, the court gave a unanimity instruction with respect to the charge of unlawfully driving or taking a vehicle.

In closing argument, defense counsel argued that [petitioner] obtained Coen's keys to her car with her permission. He claimed that the prosecutor failed to prove that [petitioner] did not obtain the car with Coen's permission in that Coen's testimony "is a blur," "imprecise," "spotty," and "unreliable." Defense counsel also noted that Coen did not want to testify and that "[h]er attitude is that this is not a stolen car case." Defense counsel focused on the statement [petitioner] made to officers at the time he was pulled over in the car and that he gave a false name because there was a traffic warrant out for his arrest, not because he was in a stolen car.

After defense counsel's closing argument and at his request, the court instructed the jury on joyriding, assuming it to be a violation of Vehicle Code section 499b, as a lesser charge, as occurring when "any person who shall without the permission of the owner thereof take any automobile for the purpose of temporarily using or operating the same . . . ."

During deliberations, the jury had a series of questions and requests to have testimony read back. The jury also questioned element two of the charge of vehicle theft, that is, a necessary finding that "[t]he other person had not consented to the taking or driving of her vehicle. . . ." The jury asked, "On second element 'permission,'" "[i]f the permission was initially given, when does permission run out." In response, the court instructed the jury in writing to see "instruction No. 23," which was the scope of consent instruction.

In reviewing a purportedly erroneous instruction, [the court] must decide whether there is a reasonable likelihood the jury applied the challenged instruction in a way that violates the Constitution. (*People v. Frye* (1998) 18 Cal.4th 894, 957. The challenged instruction must be viewed in the context of the overall charge to the jury. (*People v. Burgener, supra,* 41 Cal.3d at p. 538.)

Further, the trial court is required to instruct "upon every theory of the case supported by substantial evidence. . ." (*Montoya, supra,* 7 Cal.4th at p. 1047), that is, evidence which is "sufficient to 'deserve consideration by the jury . . . .'" (*Barton, supra,* 12 Cal.4th at p. 201, fn. 8; *Wickersham, supra,* 32 Cal.3d at p. 324.) But the trial court has the "duty 'to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues.'" (*People v. Saddler* (1979) 24 Cal.3d 671, 681, quoting *People v. Satchell*

13

(1971) 6 Cal.3d 28, 33, fn. 10; see also *People v. Mobley* (1999) 72 Cal.App.4th 761, 781.)

Vehicle Code section 10851 "prohibits driving as separate and distinct from the act of taking." (*People v. Jaramillo* (1976) 16 Cal.3d 752, 759, fn. 6; see also *People v. Cratty* (1999) 77 Cal.App.4th 98, 101-103; *People v. Strong* (1994) 30 Cal.App.4th 366, 372-376; CALJIC No. 14.36.)

When asked by the prosecutor, Coen said it was possible she had allowed [petitioner] to take the car for the evening, although she did not think she had. She was certain she did not give him the car "for a period of days." [Petitioner] argues this evidence was not sufficiently substantial to support an instruction relating to the scope of consent. [The court disagrees].

Vehicle Code, section 10851 specifies that the taking or driving of a vehicle must be without the owner's consent. Initially, [the court] notes that [petitioner's] reliance on *People v. Cook* (1964) 228 Cal.App.2d 716 for the proposition that an initial consent by the owner to the use of a car precludes forever prosecution under section 10851 is misplaced. As *People v. Hutchings* (1966) 242 Cal.App.2d 294, 295 recognized in *Cook*, the automobile dealer was defrauded, but his consent to Cook's use of the automobile was without limit. Because Cook had the owner's consent to take and drive the car as Cook wished, his taking was with the owner's consent, even though that consent had been obtained by false pretenses. Unlike the case before us, there was no viable claim in *Cook* that permission to use the car was limited and that those limits had been exceeded.

Common sense suggests that, at the moment one, who has borrowed a car uses the car in excess of the scope of the owner's consent, he then takes or drives the car without consent. The cases agree. (See *People v. Hutchings, supra,* at 295 and cases cited therein.) It was necessary to explain to the jury that the offense could be committed even though the owner of the automobile initially consented to its use. An instruction on the point was appropriate.

[Petitioner] claims "even if the jury could not decide whether to credit Allen's testimony regarding Coen giving [petitioner] the keys and consenting to his taking of the car, the instruction permitted it to deem such a factual determination superfluous to its decision. It could fail to reach a conclusion as to whether Coen initially consented to [petitioner] taking the vehicle and instead determine that, regardless of whether such consent was given, he necessarily drove the car without her consent and with a specific intent to deprive her of possession of the vehicle and was therefore guilty as charged simply because he had kept the car beyond the scope of that consent." Exactly so. Put simply, if Coen did not

14

consent to [petitioner's] use of the vehicle, he violated section 10851; if she did consent to his use of the vehicle for the evening and he kept it beyond the limits of her consent, he violated 10851. Properly instructed, the jury was justified in finding as it did under either circumstance.

Turning to the instruction itself, [petitioner] argues the instruction lessened the burden of proof regarding specific intent by suggesting to the jury that the intent need only be "'clearly established'" by proof that [petitioner] exceeded the scope of consent, which [petitioner] suggests is akin to a clear and convincing standard of proof.

While [the court] [does] not agree precisely with [petitioner's] characterization of the error, [the court agrees] the instruction misstates the law.

In order to prove the crime of unlawful taking or driving of a vehicle, the prosecution must prove beyond a reasonable doubt that the owner of the vehicle did not consent to the taking. Where the owner has consented to a limited use of the vehicle and the prosecution's theory is that [petitioner] exceeded the limited use, the prosecution must prove beyond a reasonable doubt that [petitioner] exceeded the scope of the owner's consent. If it does, the taking was without the owner's consent and this element of the crime is satisfied. If the prosecution fails to prove beyond a reasonable doubt that [petitioner] exceeded the scope of the owner's consent, the prosecution has failed in its proof as to the element relating to consent and the [petitioner] must be acquitted.

The instruction the court gave is legally deficient in two respects. First, the prosecution need not prove that the use of the vehicle "clearly and substantially" exceeded the scope of the consent given, only that it exceeded it at all. But if anything, this instructional shortcoming was to [petitioner's] benefit and it is not error as to him.

It is the final sentence of the instruction that causes the problems. Here, use of the word "not" can be taken as negating the opposite. That is, the sentence can be heard or read to say: If the use does clearly and substantially exceed the scope of the consent given, then the required criminal intent would be clearly established. There are two problems. First, the "required criminal intent" encompasses more than just a taking without consent; it requires the specific intent to deprive the owner either permanently or temporarily of title to, or possession of, the vehicle.

The instruction might be taken to say that a failure of proof on the element of consent alone will defeat criminal intent, which is true. But it could be interpreted as well to mean that the "required criminal intent under the statute would be clearly established, so

15

long as [petitioner's] use of the car "clearly and substantially" exceeded Coen's consent.  This is the same as telling the jury that, if it found [petitioner] clearly and substantially exceeded the consent, it could be that "criminal intent," that is, specific intent to deprive, had been "clearly established." Exceeding the scope of consent may be probative of specific intent, but specific intent is not necessarily conclusively proven upon a jury's decision the allowed use was clearly and substantially exceeded.

There is a second, equally troubling problem.  Again, if the use of the word "not" was taken by the jury as negating the opposite, the instruction tells the jury that the required criminal intent under the statute *would* be clearly established by a finding that the use exceeded the consent, suggesting that criminal intent *need only be* "clearly" established.  This problems gets closer to [petitioner's] complaint that the prosecution was not required to prove its case beyond a reasonable doubt.  In all, the instruction commingled and confused the issues of consent, specific intent, general criminal intent and proof beyond a reasonable doubt.

The jury knew from the instructions that a guilty verdict required the jury to find beyond a reasonable doubt that Coen had not consented to the driving or taking of her vehicle.  Upon consideration of that element of the offense, the jury may have decided that Coen initially gave [petitioner] permission to take her car for the evening, at which point it would have turned to the court's instruction on the effect of Coen's consent – and the significance of the scope of that consent – on the second element of the offense.  So doing, it may have concluded [petitioner's] "criminal intent' to keep the car beyond the owner's permission need only be "clearly established" and that it could be "clearly established," if the jury decided [petitioner] "clearly and substantially exceeded" the scope of Coen's consent.  Thus, [the court] [concludes] it is reasonably likely that [petitioner] exceeded Coen's scope of consent beyond a reasonable doubt, thus, violating [petitioner's] right to due process of law.

Having found instructional error of constitutional proportion, [the court] must assess its effect on the factfinding process at trial.  (See *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681 . . . .)  If the error was "structural," because it was the equivalent of a constitutionally deficient reasonable doubt instruction, the judgment must be reversed without regard to the strength of the evidence or other circumstances.  (*People v. Flood* (1998) 18 Cal.4th 470, 493, citing *Arizona v. Fulminante* (1991) 499 U.S. 279, 306-310 . . . .)  If the error is the instructional equivalent of misstating an element of the offense (see *Rose v. Clark* (1986) 478 U.S. 570, . . . or the equivalent of employing an erroneous conclusive presumption (see *Pope v. Illinois* (1987) 481 U.S. 497, 501-504, . . . it was a "trial error" and [the court] must apply the

harmless error analysis of *Chapman v. California* (1967) 386 U.S. 18. . . .)  Questions such as this can be close and open to disagreement.  (See *Sullivan v. Louisiana* (1993) 508 U.S. 275 . . . , conc. opn. of Rehnquish, C.J.)

[The court] [concludes] the instructional error [the court] [examines] here was a trial error.  Structural errors are those that are "structural defects in the constitution of the trial mechanism . . . affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself."  (*Arizona v. Fulminante*, *supra*, 499 U.S. at pp. 309-310. . . .)  They are rare and occur only where no criminal punishment can be regarded as fundamentally fair.  (*Rose v. Clark*, *supra*, 478 U.S. at pp. 577-578. . . .)  This was an error in the trial process.  If an error having the effect of improperly removing an element of an offense from the jury's consideration altogether is amenable to harmless error analysis (see *Pope v. Illinois*, *supra*, 481 U.S. 497. . .), so is an error that acknowledges the element, but subjects the element to a lesser burden of proof.  The harmless error doctrine properly applies to most errors, because the central purpose of a criminal trial is to determine the factual question of the defendant's innocence or guilt.

Harmless error analysis requires us to ask "whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error."  (*Sullivan v. Louisiana, supra,* 508 U.S. at p. 279 . . . .)  Put differently, [the court] must decide if "the jury's actual finding of guilty beyond a reasonable doubt *would surely not have been different* absent the constitutional error."  (*Id.* at p. 280 . . . .)

Earlier in this opinion [the court] surveyed the evidence of [petitioner's] use of the automobile.  [The court] [is] confident the jury would have found the [petitioner] guilty had it been instructed that, assuming Coen's consent to the initial taking, the jury had to find beyond a reasonable doubt from all of the facts and circumstances [petitioner] took and drove the car in a manner that exceeded that consent.  [The court] [is] equally confident that, based on all of the facts and circumstances, to the extent the jury may have been misled by the instruction on the issue of specific intent, the jury would still have found [petitioner] guilty beyond a reasonable doubt had the erroneous instruction not been given. The error was harmless beyond a reasonable doubt.

(People v. Byrd, slip op. at 15-25.)

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, the petitioner must

1   show that the ailing instruction by itself so infected the entire trial that the resulting conviction

2   violates due process.  See id. at 72.  Additionally, the instruction may not be judged in artificial

3   isolation, but must be considered in the context of the instructions as a whole and the trial record.

4   See id.  The court must evaluate jury instructions in the context of the overall charge to the jury

5   as a component of the entire trial process.  See United States v. Frady, 456 U.S. 152, 169 (1982)

6   (citing Henderson, 431 U.S. at 154).  Furthermore, even if it is determined that the instruction

7   violated the petitioner's right to due process, the petitioner can only obtain relief if the

8   unconstitutional instruction had a substantial influence on the conviction and thereby resulted in

9   actual prejudice under Brecht, 507 U.S. at 637-38.  See Hanna v. Riveland, 87 F.3d 1034, 1039

10  (9th Cir.1996).

11          As respondent notes, California Vehicle Code § 10851 provides for conviction if

12  petitioner took the car without permission, but also provides for conviction if petitioner drove the

13  car without permission.  The California Supreme Court has determined that section 10851

14  "prohibits driving as separate and distinct from the act of taking."  People v. Jaramillo, 16 Cal.3d

15  752, 758-59 n.6 (1976).  Thus, the state court's instruction as to scope of consent was relevant to

16  determine whether petitioner's continued use of the car exceeded Ms. Coen's consent, if her

17  consent had initially been given.

18          It appears from the jury's question during deliberation that they were considering

19  whether Ms. Coen may have permitted petitioner to borrow the car, but only temporarily.  "If the

20  permission was initially given, when does permission run out?"  (October 21, 2003 filing at 1.)

21  There was evidence adduced at trial that Ms. Coen would not have permanently given petitioner

22  the car.  When asked by the prosecutor, Ms. Coen said it was possible she had allowed

23  [petitioner] to take the car for the evening, although she did not think she had.  She did not even

24  know petitioner's name.  She was certain she did not give him the car "for a period of days."  Ms.

25  Coen testified that she temporarily lost her job because she could not get to work without her car.

26  /////

1  (RT 151-52.)  Even petitioner, when arrested, stated only that Ms. Coen had let him "borrow" the

2  car.

3              The fact that Ms. Coen left her purse and other personal belongings in the car as

4  well as left her house key on the car's key ring was also evidence that she did not intend to give

5  petitioner the car.

6              In addition, there was other evidence that petitioner intended to keep the car.  He

7  removed Ms. Coen's personal belongings from the car and the car radio had also been removed.

8  Petitioner's cigarettes and empty food wrappings littered the car.  The physical state of the car

9  also belied an intent to return the car to Ms. Coen.

10             The jury was properly instructed as to the crimes charged.  Count One charges a

11  violation of 10851 of the Vehicle Code, alleging that on or about June 30th the [petitioner] did

12  unlawfully drive and take a certain vehicle, to wit a 1984 Ford Mustang, personal property of

13  Lorena Coen, without the consent of and with the intent permanently or temporarily to deprive

14  said owner of title to and possession of said vehicle.  (RT 373.)  "Every person who drives or

15  takes a vehicle not his own without the consent of the owner either permanently or temporarily of

16  her title to or possession of the vehicle is guilty of a violation of this code section."  (RT 375.)

17  The jury was instructed concerning the three elements of this crime:  "First, a person took or

18  drove a vehicle belonging to another person.  Second, the other person had not consented to the

19  taking or driving of her vehicle.  And third, when the person took or drove the vehicle he had the

20  specific intent to deprive the owner either permanently or temporarily of her title to or possession

21  of the vehicle."  (RT 375.)

22             The jury was further instructed that the crime charged in count one required the

23  jury to find petitioner had the specific intent to commit the crime.  (RT 382.)  "Unless this

24  specific intent exists, the crime to which it relates is not committed."  (RT 382.)

25             The jury was instructed that "the charges place upon the prosecution the burden to

26  establish beyond a reasonable doubt that the [petitioner] is guilty of the crimes charged in the

19

1  information." (RT 374.)  The jury was instructed as to the proper definition of reasonable doubt.

2  (RT 374.)

3  It is unlikely, taking the jury instructions as a whole, that the jury would have

4  believed they could find petitioner guilty of section 10851 on evidence that was not proved

5  beyond a reasonable doubt.  The jury was instructed to consider the jury instructions as a whole

6  and not to single out any particular instruction.  (RT 362.)  After the final instruction, the jury

7  was again reminded that they were not to attach undue significance to the instructions read late in

8  the case and that all of the instructions should be considered as a whole.  (RT 419.)

9  In light of all the jury instructions as well as the evidence noted by this court and

10  the Court of Appeal, this court cannot find that the state court's decision was contrary to, or an

11  unreasonable application of Supreme Court authority or that petitioner suffered prejudice under

12  <u>Brecht</u>.  This claim should be denied.

13  C.  <u>Third Claim</u>

14  Petitioner's third claim is that his right to a fair trial was violated by the trial

15  court's use of jury instruction CALJIC No. 17.41.1.

16  The state appellate court found that any error in using CALJIC No. 17.41.1 was

17  harmless error.  (<u>People v. Byrd</u>, slip op. at 25-27.)

18  "[I]t is not the province of a federal habeas court to reexamine state-court

19  determinations on state-law questions."  <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991).  Federal

20  courts are required to defer to state court interpretations of state law unless the interpretation

21  violates due process, and "the fact that [an] instruction was allegedly incorrect under state law is

22  not a basis for habeas relief."  <u>Id</u>. at 71-72.  Federal habeas corpus relief is available on the basis

23  of instructional error only where the instruction was "not merely . . . undesirable, erroneous, or

24  even 'universally condemned,'" but that the instruction "so infected the entire trial that the

25  resulting conviction violates due process."  <u>Cupp v. Naughton</u>, 414 U.S. 141, 146-47 (1973).

26  /////

1    The Court of Appeals for the Ninth Circuit has held that the use of CALJIC No.

2  17.41.1 does not violate a petitioner's constitutional rights.  Brewer v. Hall, 378 F.3d 952 (9th

3  Cir. 2004).  The Brewer court found that no Supreme Court precedent holds that an anti-

4  nullification instruction, such as CALJIC 17.41.1, violates due process, and thus the California

5  appellate court did not unreasonably uphold the constitutionality of CALJIC 17.41.1.  Brewer at

6  956.  Because Brewer is binding authority, petitioner's third claim should be denied.

7  D.  Fourth Claim

8    Petitioner's fourth claim is that sentencing petitioner under the Three Strikes law

9  violates the ban on cruel and unusual punishment.  Petitioner notes that the United States District

10  Court for the Eastern District of California granted the petition of Terry Wayne Critton where

11  Critton received a 25 year to life sentence for a violation of section 10851 auto theft.  See CIV S-

12  05-2491 FCD GGH P.[5]  However, that case was appealed and after remand from the Court of

13  Appeals for the Ninth Circuit, the district court denied the petition.  Id.

14    Here, the state appellate court denied petitioner's claim, finding that petitioner's

15  punishment was not cruel or unusual either under California law or the United States

16  Constitution:

17        In Harmelin v. Michigan (1991) 501 U.S. 957 . . ., the United
        States Supreme Court determined that the defendant's sentence of
18      life without possibility of parole for possession of a large quantity
        of drugs (672 grams of cocaine) was not cruel or unusual.  In
19      Rummel v. Estelle (1980) 445 U.S. 263 . . ., the United States
        Supreme Court upheld a life sentence imposed under a Texas
20      recidivist statute for a defendant convicted of obtaining $120.75 by
        false pretenses after incurring previous convictions for fraudulent
21      use of a credit card ($80 worth of goods/services) and passing a
        forged check (in the amount of $28.36).  (Id. at pp. 265-266. . . .)
22      The court explained the Texas recidivist statute was "nothing more
        than a societal decision that when such a person commits yet
23      another felony, he should be subjected to the admittedly serious
        penalty of incarceration for life, subject only to the State's
24      judgment as to whether to grant him parole."  (Id. at p. 278. . . .)

25  _____

26    [5] A court may take judicial notice of court records.  See MGIC Indem. Co. v. Weisman,
   803 F.2d 500, 505 (9th Cir. 1986); United States v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980).

1      [Petitioner's] sentence is neither cruel nor unusual.  (Citation
       omitted.)

2

3  (People v. Byrd, slip op. at 29-30.)

4          In Lockyer v. Andrade, 538 U.S. 63 (2003), the United States Supreme Court

5  made clear that, in the context of an Eighth Amendment challenge to a prison sentence, the "only

6  relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of'

7  framework is the gross disproportionality principle, the precise contours of which are unclear,

8  applicable only in the 'exceedingly rare' and 'extreme' case."  Andrade, 538 U.S. at 73 (citing

9  Harmelin v. Michigan, 501 U.S. 957, 1001 (1991); Solem v. Helm, 463 U.S. 277, 290 (1983);

10  and Rummel v. Estelle, 445 U.S. 263, 272 (1980)).  The Andrade Court concluded that two

11  consecutive 25-years-to- life sentences with the possibility of parole, imposed under California's

12  three-strikes law following two petty theft convictions with priors, did not amount to cruel and

13  unusual punishment.  Id. at 77; see also Ewing v. California, 538 U.S. 11 (2003) (holding that a

14  sentence of 25 years to life imposed for felony grand theft under California's three-strikes law did

15  not violate the Eighth Amendment).  "Outside the context of capital punishment, successful

16  challenges to the proportionality of particular sentences have been exceedingly rare."  Rummel,

17  445 U.S. at 272.

18          In Ramirez v. Castro, 365 F.3d 755 (9th Cir. 2004), the United States Court of

19  Appeals for the Ninth Circuit held, post-Andrade, that a three strike sentence of twenty-five years

20  to life in prison for a third shoplifting offense, a "wobbler" under state law[6], constituted cruel and

21  unusual punishment.  In Rios v. Garcia, 390 F.3d 1082 (9th Cir. 2004), the court of appeals

22  distinguished Ramirez, finding that the petitioner in Rios had a "lengthy criminal history," had

23  "been incarcerated several times," and because the strikes used to enhance the petitioner's

24  sentence had "involved the threat of violence."  Id. at 1086.

25  _____

26      [6] A "wobbler" is an offense that can be punished as either a misdemeanor or a felony
    under applicable law.  See Ferreira v. Ashcroft, 382 F.3d 1045, 1051 (9th Cir. 2004).

1        The probation report submitted to the trial judge reflects petitioner's criminal

2   history:

3        Petitioner was convicted of driving under the influence on February 17, 1976.

4   (CT 205.)  On March 4, 1976 he was convicted of petty theft and on September 14, 1976, he was

5   convicted of resisting arrest.  (CT 205.)  On February 22, 1977, petitioner was convicted of

6   carrying a concealed weapon, a misdemeanor.  (CT 205.)  On September 12, 1977, petitioner was

7   convicted of first degree burglary, assault with a deadly weapon, false imprisonment, injuring a

8   telephone/power line, with weapon enhancements, and was sentenced to state prison for five

9   years to life.  (CT 206.)  Petitioner paroled on September 28, 1980 and was discharged from

10  parole on September 29, 1981.  (CT 206.)

11       On April 23, 1981, petitioner was convicted of possession of a hypodermic needle

12  and ordered to serve four days in jail.  (CT 207.)  On August 4, 1982, petitioner was convicted of

13  reckless driving and ordered to serve a jail sentence and pay a fine.  (CT 207.)  On July 2, 1983,

14  petitioner was convicted of being an ex-felon in possession of a firearm and committed to prison

15  for sixteen months.  (CT 207-08.)  On May 26, 2983, petitioner was convicted of assault with a

16  deadly weapon, deemed a misdemeanor, and ordered to serve a jail sentence.  (CT 208.)

17       On June 6, 1983, petitioner was convicted of petty theft and ordered to serve six

18  months in county jail.  (CT 208.)  While serving a parole revocation sentence, on or about March

19  28, 1986, petitioner walked away from a prison camp; he was convicted of escape and committed

20  to state prison for sixteen months.  (CT 208-09.)  On September 8, 1987, petitioner was

21  convicted of petty theft and ordered to serve a jail sentence.  (CT 209.)

22       On March 3, 1989, petitioner was convicted of kidnapping.  (CT 209.)  On March

23  31, 989, petitioner was sentenced to five years in state prison.  (CT 209.)  On February 26, 1993,

24  petitioner was convicted of driving under the influence and ordered to serve 90 days in county

25  jail.  (CT 210.)

26  /////

1      On May 20, 1996, petitioner was convicted of two counts of misdemeanor 647.6

2  P.C. (annoy/molest children) and ordered to serve 365 days in county jail.  (CT 211.)  On

3  December 3, 1998, petitioner was convicted of misdemeanor possession of a controlled

4  substance and sentenced to 180 days in county jail.  (CT 211.)

5      Like the petitioners in Rios and Ramirez, in the instant case petitioner's

6  commitment offense is a "wobbler" under California law.  See Ferreira v. Ashcroft, 382 F.3d at

7  1051; see also RT 578.[7]  However, the record reflects that petitioner's criminal history, including

8  the strikes that support his sentence, is more similar to the petitioner in Rios than the petitioner in

9  Ramirez.[8]  Petitioner has a lengthy criminal history that began with six juvenile offenses, and

10  include, as an adult, four prior felony convictions, three in 1977, one with use of a firearm (CT

11  206), and a fourth conviction in 1989 (CT 209-10).  Petitioner suffered two five year prison

12  sentences for those two criminal cases.  (CT 206; 210.)  The trial judge construed the 1977

13  convictions as one strike and the 1989 was the second strike used to enhance petitioner's

14  sentence.  (RT 579.)

15      Petitioner's sentence of twenty-five years to life for unlawfully driving or taking a

16  vehicle and falsely identifying himself to an officer with four prior serious felony convictions

17  does not give rise to an inference of gross disproportionality because courts have upheld longer

18  sentences for repeat offenders who committed non-violent offenses.  See, e.g., Rummel, 445 U.S.

19  at 284-85 (upholding life sentence of recidivist convicted of fraudulent use of credit card for $80,

20  passing forged check for $28.36 and obtaining $120.75 under false pretenses); United States v.

21

22      [7] The trial judge denied defense counsel's motion to reduce the instant conviction to a misdemeanor based on petitioner's criminal history.  (RT 578.)

23      [8] In addition, the district court in Critton compared Critton's sentence to the sentence
24  received by Ewing and Andrade and found Critton's 28 year criminal history made it impossible
   for Critton to prevail.  See CIV S-05-2491 FCD GGH P, citing Ewing v. California, 538 U.S. 11
25  (2003)(sentence of twenty-five years to life upheld where Ewing convicted of felony grand theft
   with four prior burglary convictions and a robbery conviction); Lockyear v. Andrade, 538 U.S.
26  63 (2003) (sentence of fifty years to life upheld where underlying crime was petty theft).
   Petitioner's criminal history is similarly unavailing.

24

1   Carr, 56 F.3d 38, 39 (9th Cir. 1995) (upholding sentence of 22 years upon conviction for sale of

2   66.92 grams of cocaine base with enhancement for two previous convictions for minor drug

3   sales); Bland, 961 F.2d at 128-29 (upholding sentence of life without parole for being felon in

4   possession of firearm and having a career criminal history).  Unlike Ramirez, petitioner has

5   served prior prison terms and county jail stints and has sustained weapons charges.  In addition,

6   petitioner's prior charges include more serious offenses than theft, including kidnaping and false

7   imprisonment.

8           While petitioner's commitment offense was relatively minor, as noted above, the

9   circumstances under which a prison sentence violates the Eighth Amendment are "exceedingly

10  rare."  Given the legal authority that binds this court, petitioner's criminal history precludes a

11  finding that his sentence violates the Eighth Amendment.

12          For the foregoing reason, IT IS HEREBY RECOMMENDED that petitioner's

13  application for a writ of habeas corpus be denied.

14          These findings and recommendations are submitted to the United States District

15  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

16  after being served with these findings and recommendations, any party may file written

17  objections with the court and serve a copy on all parties.  Such a document should be captioned

18  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

19  shall be served and filed within ten days after service of the objections.  The parties are advised

20  that failure to file objections within the specified time may waive the right to appeal the District

21  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

22  DATED:  January 31, 2006.

23

24                                          UNITED STATES MAGISTRATE JUDGE

25

26  /001; byrd2013.157